**DREWS DISTRIBUTING, INCORPORATED,**
Plaintiff–Appellee,

v.

**SILICON GAMING, INCORPORATED,**
Defendant–Appellant.

No. 00–1643.

United States Court of Appeals, Fourth Circuit.

Argued March 2, 2001.

Decided March 29, 2001.

348

**ARGUED:** Thomas Louis Stephenson, Nexsen, Pruet, Jacobs & Pollard, L.L.P., Greenville, SC, for Appellant. Robert L. Widener, McNair Law Firm, P.A., Columbia, SC, for Appellee. **ON BRIEF:** Benjamin E. Nicholson, V, McNair Law Firm, P.A., Columbia, SC, for Appellee.

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and HALL, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal arises from a dispute over the purchase of video gambling machines. We must determine the scope of an arbitration provision in a distribution contract between the manufacturer and distributor of the machines. That provision requires the parties to arbitrate "any controversy or claim" that is "related to" the distribution contract. The district court held the present dispute not arbitrable because it grew out of an earlier agreement between the parties that was expressly excluded from the reach of the distribution contract's merger clause. Finding that the present dispute is clearly "related to" the distribution contract, we reverse.

## I.

Drews Distributing, Inc. (Drews) distributes, and Silicon Gaming, Inc. (SGI) manufactures, video gambling machines. On March 31, 1998, Drews and SGI entered into a business proposal, whereby they agreed that Drews would become a distributor of SGI's "Odyssey" video gambling machine. The proposal provided that Drews and SGI would "enter into Silicon Gaming's distribution agreement, the provisions of which will be negotiated and mutually agreed upon," and stated that the proposal itself "is subject to" the parties "entering into a mutually acceptable distribution agreement." As part of the proposal, Drews purchased twenty demonstration machines.

During the summer of 1998, SGI shipped an additional 200 machines to Drews. In a letter dated December 21, 1998, and signed by both parties (the Letter Agreement), they agreed to the terms of sale of these machines. The Letter Agreement provides that: 1) the parties will draft and execute an exclusive distributor agreement; 2) upon execution of that distributor agreement, Drews will wire SGI one million dollars in partial payment for the 200 machines; 3) the parties will mutually agree to additional changes and enhancements to the machines by February 17, 1998[sic]; and 4) upon delivery of the updated hardware and enhancements, Drews will wire the outstanding balance for the 200 machines.

A few weeks later, on January 15, 1999, the parties entered into the contemplated "Distributor Agreement." In addition to setting forth the terms governing the parties' commercial dealings, the Distributor Agreement contains an arbitration clause, which provides that "any controversy or claim arising out of or related to this Agreement, or the breach hereof, will be settled by arbitration." It also contains a merger or integration clause, which states that:

> This Agreement, with the exception of the Letter Agreement signed and dated December 21, 1998 by SGI and Drew[sic] Distributing, Inc., including all Exhibits to this Agreement, which are hereby incorporated by reference, represents the entire agreement between the parties relating to its subject matter and supersedes all prior representations, discussions, negotiations, and agreements, whether written or oral.

Drews paid SGI one million dollars upon the execution of the Distributor Agreement. However, Drews ultimately refused to pay SGI the balance owed on the 200 machines, claiming that SGI did not adjust the machines for the South Carolina market and neglected to inform Drews of an outstanding intellectual property issue. Additionally, in the interim, the South Carolina legislature had determined that this type of gaming machine would soon be illegal in the state. On October 25, 1999, SGI filed a demand for arbitration with the American Arbitration Association seeking to recover from Drews the balance of the cost of the 200 machines.

On December 10, 1999, before arbitration and during ongoing settlement negotiations, Drews filed this action against SGI in the federal court. The complaint—invoking only the terms of the Letter Agreement—alleges fraud, breach of contract accompanied by a fraudulent act, and neg-ligent misrepresentation and requests declarations canceling the Letter Agreement and denying arbitrability of the dispute. Drews also moved to stay arbitration. SGI responded with a motion to dismiss or stay the federal action.

The district court ordered the arbitration stayed. The court reasoned that the present controversy arose under the Letter Agreement, not the Distributor Agreement, and because the merger clause in the Distributor Agreement assertedly "except[ed]" the Letter Agreement from the "subject matter" of the Distributor Agreement the controversy was not "related to" the Distributor Agreement and so "not subject to arbitration." SGI now appeals.

II.

The Federal Arbitration Act, 9 U.S.C. § 1 (1994), embodies a federal policy favoring arbitration. Thus, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Of course, whether a party has agreed to arbitration is a matter of contract interpretation and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). However "the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration." *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.,* 867 F.2d 809, 812 (4th Cir.1989). A court should not deny a request to arbitrate an issue "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers

the asserted dispute." *Warrior & Gulf Navigation Co.*, 363 U.S. at 582–83, 80 S.Ct. 1347.

In the case at hand, the arbitration clause in the Distributor Agreement is a "broad" one, covering as it does "any controversy or claim arising out of or related to" that agreement. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (recognizing as "broad" a clause requiring arbitration of "[a]ny controversy or claim arising out of or relating to" the agreement); *International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416 n. 3 (4th Cir.2000) (recognizing as "broad" an arbitration clause requiring arbitration of "[a]ny dispute arising out of the Contract"); *see also J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir.1988).

▮ Notwithstanding the strong federal policy favoring arbitration and the breadth of the arbitration clause in the Distributor Agreement, Drews maintains that the present dispute is not arbitrable because it grows out of the Letter Agreement, which contains no arbitration provision. Drews points to its complaint noting that it invokes causes of action in tort or arising out of the Letter Agreement and does not rely on the Distributor Agreement. But the reach of an arbitration clause is not restricted to those causes of action brought under the contract containing the clause, unless the parties draft a clause so restricted in scope. *See J.J. Ryan*, 863 F.2d at 319 (arbitrability determined by examination of "the factual allegations underlying the claim ... regardless of the label assigned to the claim"). Nor can a party retroactively restrict or eliminate its contractual obligation to arbitrate a dispute by fashioning a limited complaint.

▮ In this case, the parties contractually agreed to arbitrate "any controversy or claim" between them "arising out of or related to" the Distributor Agreement; that remains their obligation. It is immaterial that the present dispute grew out of the Letter Agreement, which contains no arbitration clause, if the dispute also "relates to" the Distributor Agreement. *See, e.g., Kvaerner ASA v. Bank of Tokyo–Mitsubishi, Ltd.*, 210 F.3d 262, 265 (4th Cir.2000) (dispute growing out of con-tract with no arbitration clause, but which stated parties had "rights and remedies" under another contract with such a clause, is arbitrable). The question before us is not whether this dispute, as to the payment for 200 video gambling machines, grows out of the Letter Agreement or the Distributor Agreement, but rather whether it is "related to" the Distributor Agreement.

Examination of the factual allegations of the complaint compels the conclusion that the instant dispute is, in fact, "related to" the Distributor Agreement. In its complaint, Drews alleges that SGI misrepresented certain facts to entice Drews to purchase the 200 video gambling machines and "enter into a Distributorship Agreement with SGI." Although the complaint carefully alleges only fraud in inducing Drews to enter into the Letter Agreement (and not the Distributor Agreement), it expressly acknowledges, as it must, that the Letter Agreement "contemplated" that the parties would enter into the Distributor Agreement, which "would control the rights of the parties as to the sale of these Odyssey machines" and that, in fact, the parties did enter into this Distributor Agreement less than a month later, on January 15, 1999. Moreover, the Letter Agreement, which Drews maintains provides the sole contractual basis for this controversy, explicitly conditions Drews' obligation to purchase the video gambling

machines on the execution of the Distributor Agreement. Indeed, the record reveals that the Distributor Agreement governs all sales of SGI machines to Drews, including those encompassed by the Letter Agreement.[1] Hence, it is plain that the present suit—a dispute over payment for 200 video gambling machines—"relates to" the Distributor Agreement.

■ Nevertheless, Drews contends, and the district court found, that Drews' claims are not arbitrable. That conclusion relies on the merger clause in the Distributor Agreement, which provides:

> This Agreement, with the exception of the Letter Agreement signed and dated December 21, 1998 by SGI and Drew[sic] Distributing, Inc., including all Exhibits to this Agreement, which are hereby incorporated by reference, represents the entire agreement between the parties relating to its subject matter and supersedes all prior representations, discussions, negotiations and agreements, whether written or oral.

Drews maintains that this clause "carved out" the Letter Agreement from all of the terms of the Distributorship Agreement, including its arbitration clause. The district court agreed, holding that the merger clause's statement that the Distributor Agreement "represents the entire agreement between the parties relating to its subject matter" resulted in the clause "except[ing] the Letter Agreement from the subject matter of the Distributor Agreement."

This reading of the merger clause turns the clause on its head. The purpose of this merger clause, like any merger or integration clause, is to clarify that the contract in which it is contained is the parties' entire agreement. In this case, the parties excepted the Letter Agreement from the sweep of the merger clause because Drews still owed SGI money under the Letter Agreement. By excepting the Letter Agreement from the merger clause the parties acknowledged the pre-existing obligation in the Letter Agreement. Thus, they excepted the Letter Agreement in order to prevent it from being superceded by the Distributor Agreement, but they did not except the Letter Agreement from the subject matter of the Distributor Agreement. To hold otherwise would endow the integration clause with a meaning well beyond the purpose of such clauses—simply to make plain that the contract contained the entire agreement of the parties.

*Security Watch Inc. v. Sentinel Sys. Inc.*, 176 F.3d 369 (6th Cir.1999), on which the district court relied, is not to the contrary. Indeed, it is entirely consistent with the result we reach. In that case, the parties entered into seven annual contracts governing the sale of products in seven successive years. The first six annual contracts contained no arbitration clause; the seventh, the 1994 contract, provided for arbitration of claims "arising out of or relating to the Products furnished pursuant to this Agreement or acts ... under this Agreement." *Id.* at 372. The earlier contracts did not state, or even suggest,

---

1. Even the very first twenty demonstration machines Drews purchased from SGI, under the business proposal, were conditioned on the terms of the contemplated Distributor Agreement. Drews' CEO stated in a March 30, 1997 letter to SGI that "Drews also understands that the purchase of the demonstration units is final and non-cancelable, but that the terms and conditions of sale specified in the Silicon Gaming, Inc. Distributor Agreement apply to this purchase." Thus, it was apparently understood from the inception of this business relationship that all disputes would be governed by the forthcoming Distributor Agreement.

that they were conditioned on execution of the 1994 contract. The Sixth Circuit held that the arbitration clause only controlled disputes relating to products shipped and acts done under the 1994 contract and did "not reach disputes relating to products shipped under earlier agreements." *Id.*[2] In contrast, here the term of the Distributor Agreement is not limited to twelve months, its arbitration clause is not restricted to disputes relating to "products furnished" or "acts under ... this Agreement," and the Letter Agreement expressly states that the obligation to purchase the 200 gambling machines is conditioned on execution of the Distributor Agreement.

For these reasons, we must reverse the district court's order staying arbitration and remand with directions that the case proceed to arbitration in accordance with the parties' agreement.[3]

*REVERSED AND REMANDED.*

---

2. Tellingly, the *Security Watch* court expressly *rejected*, as we do, the contention that the merger clause in the 1994 contract could be read to have other than its "universally understood purpose" of "signal[ing] to the courts that the parties agree that the contract is to be considered completely integrated." *Id.*

3. In a footnote, the district court stated that a stay of arbitration was also warranted because "SGI's affidavit would at best only create an issue of fact as to the coverage of the arbitration clause.... As such, Drews would be entitled to a jury trial on the issue of whether there was an agreement to arbitrate claims related to the Letter Agreement." The Federal Arbitration Act provides for a right to a jury trial when "the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue." 9 U.S.C. § 4 (1994). However, "[a] party resisting arbitration cannot obtain a jury trial merely by demanding one; rather he bears the burden of showing that he is entitled to a jury trial under § 4 of the [Act]". *Doctor's Assoc. v. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996) (internal quotation marks omitted). "To establish a genuine issue entitling a party to a jury trial, 'an unequivocal denial that the agreement [to arbitrate] had been made [is] needed, and some evidence should [be] produced to substantiate the denial.' " *Id.* at 984. (quoting *Interbras Cayman Co. v. Orient Victory Shipping Co.*, 663 F.2d 4, 7 (2d Cir.1981)). Here, no party "unequivocal[ly] den[ies]" that an "agreement to arbitrate has been made." Their sole disagreement is as to the scope of that agreement. Thus, a jury trial to resolve this issue would contravene the Federal Arbitration Act.